UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

LORIE M. GUYES, individually,
and as representative of a Class of
Participants and Beneficiaries of the
Nestle 401(k) Savings Plan,                      Case No. 1:20-cv-1560-WCG

      Plaintiff,

      v.

NESTLE USA, INC.,

      and

BOARD OF DIRECTORS OF
NESTLE USA, INC.,

      Defendants

---

## AMENDED COMPLAINT

COMES NOW Plaintiff, Lorie M. Guyes, individually and as representative of a Class of Participants and Beneficiaries on behalf of the Nestle 401(k) Savings Plan (the "Plan"), by her counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the following:

### INTRODUCTION

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530). "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.      Defendants, Nestle USA, Inc. ("Nestle"), and the Board of Directors of Nestle USA, Inc. ("Board Defendants") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the Nestle 401(k) Savings Plan ("The Plan") – that it sponsors and provides to its employees.

6. Plaintiff alleges that during the putative Class Period (July 13, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and managed account] fees," *Hughes*,142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Voya.

7. These objectively unreasonable recordkeeping and investment fees cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8. Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive recordkeeping and managed account fees.

9. Defendants engaged in self-dealing in violation of ERISA's duty of loyalty, Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and fiduciary prohibited transaction provisions, Section 406(b)(1), 29 U.S.C. § 1106(b)(1), with regard to the administration of the Plan by paying itself as a service provider with Plan assets.

10. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping and managed account services.

11. ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping and managed account fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

12. There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

13.     The unreasonable recordkeeping and managed account fees paid inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

14.     These breaches of fiduciary duty, and violation of the prohibited transaction provisions, caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

15.     To remedy these fiduciary breaches and prohibited transactions, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

17.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

19.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

20.     Plaintiff, Lorie M. Guyes, is a resident of the State of Wisconsin and currently resides in Appleton, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

21.     In approximately April 2008, Plaintiff commenced employment with Nestle USA in the position of General Laborer, and on April 13, 2020, Plaintiff's employment with Nestle ended.

22.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries to her Plan account through paying excessive recordkeeping fees to Voya, those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Voya as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

23.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injuries, including for excessive managed account services and self-dealing by Defendants.

24.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping and managed account fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

25.     Having never managed a mega 401(k) Plan, meaning a plan with more than $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement*

*Plan Landscape Report* 18 (March 2022), Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

26.     Nestle USA Inc. ("Nestle"), under the Plan Sponsor name of Nestle USA, Inc. Savings Plan Administration, is located at 30500 Bainbridge Road, Solon, OH 44139-2216. In this Complaint, "Nestle" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain. Nestle is composed of seven operating companies: Nestlé USA, Nestlé Waters North America, Nestlé Purina, Gerber, Nestlé Health Science, Nestlé Professional, and Nespresso. Nestlé is home to more than 200 U.S. locations in 34 states, including 68 manufacturing facilities. Nestle employs more than 36,000 people in the United States.

27.     Nestle acted through its officers, including the Board Defendants, to perform Plan-related fiduciary functions in the course and scope of their business. Nestle appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Nestle is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

28.     Nestle is both the Plan sponsor and the Plan Administrator of the Nestle Inc. 401(k) Savings Plan.  As the Plan Administrator, Nestle is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). Nestle has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

29.     The Plan is a "defined contribution" pension Plan under 29 U.S.C. §1102(2)(A) and 1002(34), meaning that Nestle's contribution to the payment of Plan costs is guaranteed

but the pension benefits are not. In a defined contribution Plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826.

30.     The Plan currently has about $4,200,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

31.     With 39,472 participants in the year 2018, the Plan had more participants than 99.97% of the defined contribution Plans in the United States that filed 5500 forms for the 2018 Plan year. Similarly, with $4,292,939,117 in assets in the year 2018, the Plan had more assets than 99.97% of the defined contribution Plans in the United States that filed 5500 forms for the 2018 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

32.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

33.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

34.     Although Nestle contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping or investment fees.

35. While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

36. Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

37. Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

<u>Recordkeeping Services</u>

38. Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans. Voya is one such recordkeeper.

39. These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard, bundled offerings of the same level and quality.

40. There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that

the services are provided in retirement industry parlance on an "all-you-can-eat" basis.) The

Bundled RKA services include, but are not limited to, the following standard services:

a.   Recordkeeping;

b.   Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.   Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.   Maintenance of an employer stock fund (if needed);

f.   Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.   Plan consulting services including assistance in selecting the investments offered to participants;

h.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

41.     The second type of essential RKA services, hereafter referred to as "Ad Hoc

RKA" services, provided by all recordkeepers, often have separate, additional fees based on

the conduct of individual participants and the usage of the service by individual participants (usage fees).

42.     These "Ad Hoc RKA" services typically include, but are not limited to, the following:

a.     Loan processing;

b.     Brokerage services/account maintenance;

c.     Distribution services; and

d.     Processing of Qualified Domestic Relations Orders (QDROs).

43.     For mega plans, like the Nestle Plan, any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

44.      Industry experts know that all recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

45.     Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

46.     Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

47.      Plan fiduciaries routinely request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan. And they

request that the Bundled RKA revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate.

48.     While there may be minor differences in the way the Bundled RKA services are delivered, those differences are immaterial to the price comparisons in virtually all cases.

49.     Whether the minor differences be in the number of staff utilized for call center support, the frequency of participant communications, or the number of investment education sessions held by the plan sponsor, these differences are immaterial when considering the level and quality of services provided by the plan from a cost perspective.

50.     The Nestle Plan had a standard package of Bundled RKA services, providing RKA services of a nearly identical level and quality to other recordkeepers who service other mega plans.

51.     There is nothing in the service and compensation codes disclosed by the Plan fiduciaries in their Form 5500 filings during the Class Period, nor anything disclosed in the Participant section 404(a)(5) fee and service disclosure documents, that suggests that the annual "recordkeeping fees" charged to participants included any services that were unusual or above and beyond the standard recordkeeping provided by all national recordkeepers to mega plans.

52.     Accordingly, the disparity between the Plan's recordkeeping fee, and the fee paid by several other similarly sized plans for the same standard bundle of RKA services, cannot be explained by any additional services, or the quality of those services, provided by Voya to the Plan.

53. Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

54. Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased, partially because of the success of class fee litigation. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

55. By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Nestle Plan. In other words, reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period.

56. The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan. As a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline.

57. The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

58. As a result, recordkeepers make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise

have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

59.    Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

60.    Regardless of the pricing structure that the plan fiduciary negotiates with a service provider, and Plaintiffs express no preference, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable (not the *cheapest* or *average*) given the applicable market.

61.    As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by understanding the market for such recordkeeping services.

## Managed Account Service Fees

62.    During the Class Period, Defendants selected and made available to Plan participants managed account services through Voya's subsidiary, Voya Retirement Advisors, LLC ("Voya Retirement").

63.    In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his or her account in a portfolio of preselected investment options.

64.    Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"),

*401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

65. The assets of a participant signing up for a managed account service are generally managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

66. In practice, little to no material customization is provided to the vast majority of plan participants which results in no material value to most participants relative to the fees paid.

67. Many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

68. Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for these services are often tiered. For example, the first $100,000 of assets may be charged a certain fee rate, the next $150,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

69. The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

70. For at least the past decade, mega plans have been able to negotiate multiple facets of the fees charged by managed account providers.

71. Managed account services are offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan.

72.    The covered service provider will promote the managed account services over other potential solutions because the covered service provider will earn more revenue when participants use the managed account services.

73.    As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service at a much lower cost.

74.    As with recordkeeping services, prudent fiduciaries regularly monitor the amount of managed account service fees the plan is paying and ensure the fees are reasonable compared to what is available in the market for materially similar services.

75.    The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate most-favored nation clauses with the managed account service providers and/or the recordkeepers.

76.    Defendants caused Nestle Plan participants to pay excessive fees for managed account services to Voya Retirement.

77.    Defendants could have reduced these fees charged by Voya Retirement by periodically soliciting bids from other managed account service providers and/or staying abreast of the market rates for managed account solutions to negotiate market rates, or by just offering target date funds instead.

78.    The excessive fees paid by Plan participants to Voya Retirement using the managed account service were not objectively reasonable and breached Defendants' fiduciary duties of prudence to Class members, causing millions of dollars of lost retirement account funds.

## THE PLAN

79.     During the entire Class Period, the Plan received recordkeeping services from Voya.

80.     At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants.

81.     The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega plans, like the Nestle Plan, regardless of the number or level of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500.

82.     It is clear based on the 5500 forms and 404(a)(5) participant disclosures that Voya did not provide any services at any higher level that were not also part of the standard package of RKA services provided by all recordkeepers to mega plans. These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

83.     During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

84.      Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RECORDKEEPERS

85.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, through soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

86.     Prudent plan fiduciaries can easily and inexpensively receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees.

87.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

88.     A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

89.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

90.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

91.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a

plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

92. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

93. Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

94. A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

95. During the Class Period, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to recordkeepers, including but not limited to Voya.

96. During the Class Period, Defendants failed to effectively solicit quotes and/or competitive bids from other recordkeepers, including but not limited to Voya, in order to avoid paying unreasonable recordkeeping fees.

97. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed an imprudent process that was done ineffectively given the objectively unreasonable recordkeeping fees it paid to Voya, and in light of the level and quality of recordkeeper services it received.

98.     From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RK&A fees illustrating that the Plan had on average 39,557 participants and paid an average effective annual RK&A fee of at least approximately $2,357,846, which equates to an average of at least approximately $60 per participant. These are the minimum amounts that could have been paid:

| Recordkeeping and Administration (RK&A) Fees | | | | | | |
|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | *Average* |
| Participants | 39,375 | 39,841 | 40,098 | 39,000 | 39,472 | *39,557* |
| Est. RK&A Fees | $2,461,663 | $2,756,235 | $2,592,736 | $1,847,621 | $2,130,973 | *$2,357,846* |
| Est. RK&A Per Participant | $63 | $69 | $65 | $47 | $54 | *$60* |

99.     After the fee reductions during the Class Period, Plaintiff did not notice any reduction in services, nor did she receive any communications from Plan fiduciaries that a reduction in services was the cause of the fee reduction.

100.    From the years 2014 through 2018, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above):

### Comparable Plans' RK&A Fees Based on Publicly Available Information from Form 5500 [1]

| Plan | Participants | Assets | RK&A Price | RK&A Price /pp | Recordkeeper | Graph Color |
|------|-------------|--------|------------|---------------|--------------|-------------|
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| The Tax Sheltered Annuity Plan Of Texas Children'S Hospital | 13,950 | $993,649,270 | $416,395 | $30 | Fidelity | White |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $516,000 | $32 | Voya | White |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $1,040,153 | $33 | Alight | White |
| Kindred 401(k) | 34,092 | $1,299,328,331 | $1,121,564 | $33 | T. Rowe Price | White |
| The Savings And Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard | White |
| **Nestle 401(K) Savings Plan Average Fee** | **39,557** | **$4,140,807,574** | **$2,357,846** | **$60** | **Voya** | **Red** |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard | White |
| Sutter Health 403(B) Savings Plan | 73,408 | $3,681,162,013 | $1,908,133 | $26 | Fidelity | White |
| Google LLC 401(K) Savings Plan | 82,725 | $11,786,824,293 | $1,676,414 | $20 | Vanguard | White |
| Raytheon Savings And Investment Plan | 82,788 | $17,243,679,305 | $2,292,583 | $28 | Fidelity | White |

[1]Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available.

101.   From the years 2014 through 2018, the graph below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



102.    From the years 2014 to 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual RK&A fee paid of at least $60 per participant for RK&A services.

103.    As noted above, the more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Bundled RKA services.

104.    When a plan fiduciary follows prudent practices as outlined by the Department of Labor ("DOL") and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Bundled RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to

negotiate a Bundled RKA fee lower than the trend line such that the total RKA fee would be proximate to the trend line.

105. From the years 2014 through 2018, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RKA fee of around $28 per participant, if not lower.

106. From the years 2014 through 2018, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $2,357,846 per year in RK&A fees, which equated to an effective average of approximately $60 per participant per year.

107. From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for RK&A services approximately $1,107,602, per year in RK&A fees, which equates to approximately $28 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay more than double what they could otherwise pay for RK&A services.

108. From the years 2014 through 2018, the Plan additionally cost its participants on average approximately $1,250,244 per year in RK&A fees, which equates to on average approximately $32 per participant per year.

109. From the years 2014 to 2018, and because Defendants did not act prudently, and as compared to other Plans of similar sizes with similar amounts of money under

management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $6,251,221 in unreasonable and excessive RK&A fees.

110.    From the years 2014 to 2018, because Defendants did not act prudently, and as compared to other Plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its Plan participants (when accounting for compounding percentages) a total, cumulative amount in excess of $7,395,159 in excessive RK&A fees.

111.    Defendants could have offered the exact same recordkeeping services, at the same level and quality, at a lower cost by using a different recordkeeper, but did not do so.

112.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans are providing the exact same level and quality of services.

113.    Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Voya, and Defendants could have obtained the same recordkeeping services for less from other, similar recordkeepers if only an effective process had been completed.

114.    The higher cost recordkeeping services selected by Defendants were substantially identical to lower-cost recordkeeping services available in the market as highlighted by the chart above.

115. Plaintiff paid these excessive recordkeeping fees in the form of direct compensation to the Plan and suffered injuries to her Plan account as a result.

116. Plaintiff participated in several 401(k) plans from several employers and there have been no material differences in the services that she has received.

117. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any effective examination and competitive comparison of the RKA fees it paid to Voya vis-à-vis the fees that other RKA provider, including T. Rowe Price and Vanguard, would charge, and would have accepted, for the same level and quality of services.

118. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in an effective examination and comparison of the Plan's RKA fees it paid to Voya, but Defendants did so ineffectively given that it paid more than twice as much for RKA fees than it should have.

119. During the entirety of the Class Period, and had Defendants engaged in an effective examination comparison of the RKA fees it paid to Voya through a prudent fiduciary process, it would have realized that the Plan was compensating Voya unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants, and should have removed Voya.

120. The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. In other words, any difference in recordkeeping fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

121. The market for RKA services for mega plans, like the Nestle Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for RKA services and what he reasonable fair market fee was for identical services.

122. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RKA fees than they should have been and/or by failing to take effective remedial actions including removing Voya as Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants.

### THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

123. Since at least 2010, Defendants retained Voya's wholly-owned subsidiary, Voya Retirement, to provide a managed account service through which Voya Retirement charged Plan participants a managed account fee.

124. The Defendants made available to Plan participants a managed account service called the "Professional Management" service, which was offered by the Plan's recordkeeper, Voya Retirement.

125. For this service, up through the end of 2019, Defendants have allowed participants to pay an annual fee of at least 0.50% on the first $100,000, 0.40% on the next $150,000, and 0.25% on assets greater than $250,000.

126. The table below illustrates the fee rates paid by similarly situated plans for materially identical managed account services:

| Managed Account service fee rates of similarly situated plans | Fee on 1st Tier | Fee on 2d Tier | Fee on 3d Tier |
|---|---|---|---|
| Nestle "Professional Management" service | 0.50% | 0.40% | 0.25% |
| AGFA Healtkcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

127. As illustrated above, in all cases, the participants in the other comparator plans are paying fee rates at most every tier lesser than Plan participants.

128. A number of other managed account providers also exist whose services are virtually identical to the services provided to Plan participants through the "Professional Management" service and whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the Nestle Plan.

129. The Kimberly-Clark 401(k) Profit Sharing and Retirement Plan, a similar mega Plan to the Nestle Plan, provided in 2020 managed account services through Fidelity to its participants at a much lower price on the following schedule: no fee up to the first $5000, 0.25% up to $100,000, 0.15% on the next $150,000, and 0.10% on assets greater than $250,000.

130. The fee rates paid by the Plan participants for the Nestle Professional Management fee was excessive and objectively unreasonable given the Plan's size and negotiating power.

131. Defendants could have offered the exact same managed account services at a lower cost by using a different managed account provider or by utilizing a target

date fund, but did not do so.

132.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these managed account allegations are not about reasonable tradeoffs between managed account service providers offering a different level or quality of services.

133.    Rather, Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing managed account service provider, and Defendants could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

134.    The asset allocation created by the Voya Retirement was not materially different than the asset allocation of the age appropriate target date option made available to the Plan's participants at a much lower fee.

135.    As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For example, in one recent study, a record keeper that offers managed accounts through its platform showed that there are other ways to diversify using professionally managed allocations, such as target date funds, which can be less costly." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed*

*Accounts*, at 32 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

136.   As a result, based on the value provided, the reasonable fee for Plan's Professional Management by Voya Retirement cost the Plan millions of dollars of wasted managed account service provider fees.

136.   Defendants did not prudently evaluate the incremental value provided by the Plan's "Professional Management" service to determine that the fees were warranted.

137.   A prudent fiduciary would have conducted periodic competitive solicitations (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, Plaintiff and Plan participants would not have paid the excessive managed account service fees that they did.

138.   Sometime in 2019, the fee on the first asset tier was reduced to 0.45% starting on January 1, 2020.  Despite all the information noted above about market alternatives being equally, or even more easily available to Defendants, no other fee reductions were implemented on January 1, 2020.

139.   This lack of provided prudent fees for managed account services is further evidence of Defendants' imprudence and failure to determine reasonable fees for the services provided.

140.   It is further evidence that supports a reasonable inference that the Defendants did not determine the reasonable market rate for the services provided

nor did they determine that the incremental fees required of the service were warranted by the incremental value, or lack thereof, provided by the service.

141. Defendants' failure to properly monitor or control fees for the Plan's managed account service costs resulted in Plan participants paying excessive and objectively unreasonable fees, constitutes a separate and independent breach of the fiduciary duty of prudence, and cost Plaintiff and Plan participants who used the services millions of dollars of harm to their retirement accounts.

## SELF DEALING

142. Nestle is a fiduciary of the Plan because it exercises discretionary authority, responsibility, and control over the management and administration of the Plan and exercises authority and control over Plan assets.

143. Based on publicly available DOL 5500 Forms, Nestle paid itself, for providing unspecified services to the Plan. Specifically, based on information provided by Nestle in its 5500 filings, the following amounts were paid out of plan assets to Nestle from 2014 through 2018:

**Nestle 401(k) Savings Plan proportion of Nestle In The USA Savings Trust Schedule C - Commissions and Fees** (services other than Investment Management)

| Provider | Relationship | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| NESTLE USA | EMPLOYER | $507,842 | $599,187 | $266,913 | $562,615 | $635,053 | $2,571,610 |

144. The services purportedly provided to the Plan by "Nestle USA" did not provide any value to the Plan, were not provided for the exclusive benefit of the Participants, and did not warrant the payment of the fees to Nestle USA.

145. The services purportedly provided to the Plan by "Nestle USA" are standard services that can be provided by the Plan's recordkeeper, Voya

146. Defendants' payment of these fees to itself out of plan assets represents self-dealing and a clear conflict of interest with the Plan and Plan participants and violates the duty of loyalty it owes to Plan Participants under ERISA Section 404(a)(1)(A); 29 U.S.C. § 1104(a)(1)(4).

147. The payments to itself of these RKA fees also constitute a fiduciary prohibited transaction by Defendants as fiduciaries to the Plan. ERISA Section 406(b), 29 U.S.C. §1106(b)(1).

148. Defendants are obligated to disgorge to the Plan all amounts it received and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. ERISA Section 409(a), 29 U.S.C. §1109(a).

## CLASS ACTION ALLEGATIONS

149. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

150. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Nestle 401(k) Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning six years before the commencement of this action and running through the date of judgment.

151. The Class includes more than 39,000 members and is so mega that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

152. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty;

- Whether Nestle engaged in fiduciary prohibited transactions; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

153. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

154. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous

representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

155. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

156. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

157. Plaintiff's attorney is experienced in complex ERISA and class litigation and will adequately represent the Class.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class – RK&A Fees)**

158. Plaintiff restates the above allegations as if fully set forth herein.

159. Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

160. 29 U.S.C. §1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

161. Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable RK&A fees.

162. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RK&A fees were reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

163. During the Class Period, Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to: ensure that the Plan's RK&A fees were reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

164. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

165. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process by failing to

evaluate the cost and performance of the Plan's recordkeeper critically or objectively in comparison to other substantially similar recordkeeping options.

166.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

167.    As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

168.    Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

## SECOND CLAIM FOR RELIEF
### Breaches of Duty of Prudence of ERISA, as Amended
### (Plaintiff, on behalf of herself and Class, Against Defendants – Managed Account Service Fees)

169.    Plaintiffs restate the above allegations as if fully set forth herein.

170.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

171.   29 U.S.C. §1104(a)(1)(B) imposes fiduciary duties of prudence upon Defendants in their administration of the Plan. Defendants, as fiduciaries of the Plan, are responsible for selecting a managed account service provider that charges reasonable managed account service fees.

172.   During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

173.   During the Class Period, among other things, Defendants imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses.

174.   During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's managed account provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

175.   During the Class Period, Defendants breached its duty to Plan participants by failing to employ a prudent process by failing to evaluate the cost of the Plan's managed account provider critically or objectively in comparison to other managed account options, or in comparison to less costly target-date funds.

176. Defendants' failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

177. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

178. Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
#### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
#### (Plaintiff, on behalf of herself and Class – RK&A Fees)

179. Plaintiff restates the above allegations as if fully set forth herein.

180. Defendants had the authority to appoint and remove members or individuals responsible for Plan RK&A fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

181. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RK&A fees to ensure that they were adequately

performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

182. Defendants Nestle and its Board had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

183. The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

    a.    Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably recordkeeping expenses;

    b.    Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

    c.    Failing to remove individuals responsible for Plan recordkeeping fees whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs even though solicitation of competitive bids would have shown that maintaining Voya as recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

184. As the consequences of the breaches of the duty to monitor for recordkeeping fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

185. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class – Managed Account Fees)**

186. Plaintiff restates the above allegations as if fully set forth herein.

187. Defendants had the authority to appoint and remove members or individuals responsible for Plan managed account fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

188. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan managed account fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

189. Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the

information on which they based their decisions and analysis with respect to the Plan's managed accounts; and reported regularly to Defendants.

190.　The objectively unreasonable and excessive managed account fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

    d.　Failing to monitor and evaluate the performance of individuals responsible for Plan managed account fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably managed account expenses;

    e.　Failing to monitor the process by which individual responsible for managed account fees investigated the availability of more reasonably-priced managed account fees; and

    f.　Failing to remove individuals responsible for Plan managed account fees whose performance was inadequate in that these individuals continued to pay the same managed account costs even though solicitation of competitive bids would have shown that maintaining those managed account services, was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

191.　As the consequences of the foregoing breaches of the duty to monitor for managed account fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

192.　Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan managed account fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## FIFTH CLAIM FOR RELIEF
### Fiduciary Prohibited Transactions under ERISA, as Amended, And Breach of Duty of Loyalty of ERISA, as Amended (Plaintiff, on behalf of herself and Class – Defendant Nestle for Self-Dealing)

193.   Under ERISA Section 404(a)(1)(A), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

194.   Under ERISA Section 406(b)(1), "[a] fiduciary with respect to a plan shall not— (1) deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

195.   Defendants, as fiduciaries to the Plan, did not discharge their duties with respect to the Plan solely in the interest of Plan participants and for the exclusive purpose of providing benefits to participants and their beneficiaries, instead engaging in self-dealing and unlawfully paying itself from plan assets, for Plan services.

196.   Defendants dealt with the assets of the Plan in their own interest and for their own account by diverting plan assets to itself instead of using the plan assets for the exclusive benefit of Plan participants. ERISA Section 406(b)(1); 29 U.S.C. §1106(b)(1).

197.   The payments to themselves for purported Plan administration purposes constitutes a fiduciary prohibited transaction by Defendants as fiduciaries

to the Plan because Defendants dealt with the assets of the plan for their own interest and for their own account.

198.    Defendants are obligated to disgorge to the Plan all amounts they received and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. 29 U.S.C. §1109(a); *Barboza v. California Assn. of Prof. Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 750 (6th Cir. 2014)

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty and for engaging in prohibited transactions, including restoring to the Plan all losses resulting from imprudent selection of recordkeeping and managed accounts services and self-dealing, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.    An Order requiring Defendant Nestle to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Nestle as necessary to effectuate relief, and to prevent Nestle' unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 31st day of August, 2022

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

s/ *Paul M. Secunda*
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Paul M. Secunda, State Bar No. 1074127

WALCHESKE & LUZI, LLC
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com